IN THE UNITED STATES DISTRICT COURT
FOR NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br>• **TCL flip phone, Grey in color, model: T408DL, IMEI: 0116144000853794**<br>• **Apple iPhone, model: S (1633), black and grey in color**<br>• **Apple iPhone, blue in color, with three camera lenses on the rear, in black case**<br>• **Apple iPhone, model: S (1633), black and grey in color**<br>Currently located at 420 Madison Ave., Toledo, Ohio. | Case No. 3:23MJ5151 |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, James A. Sutphin, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. This affidavit is made in support of an Application for a Warrant to Search Property, specifically: cellular telephones identified as an **TCL flip phone, grey in color, model: T408DL, IMEI: 0116144000853794 (Subject telephone - 1); Apple iPhone, model: S (1633), black and grey in color (Subject telephone – 2); Apple iPhone, blue in color, with three camera lenses on the rear, in black case (Subject telephone – 3); Apple iPhone, model: S (1633), black and grey in color (Subject telephone – 4).** For the reasons stated herein, there is probable cause to believe that the referenced phone contains evidence, as described in Attachment A, as it pertains to an investigation concerning the commission of a violation of Title 21, U.S.C., Sections 841(a)(1), (b)(1)(A) and (b)(1)(B), Possession with Intent to Distribute

Fentanyl, Title 18, U.S.C., Section 922(g), Felon in Possession of a Firearm, and Title 21, U.S.C., Sections 846, Conspiracy to Possess with the Intent to Distribute a Controlled Substance.

2. I have been a police officer since 2012. I am currently assigned, as of September 2018, to the FBI's Toledo RA, Violent Crime Task Force, and am also attached to the Toledo Metro Drug Task Force. Prior to my current assignment, I was assigned to the Toledo Police Gang Task Force. I have previously participated in investigations which led to the arrest and conviction of narcotics dealers and other violent criminals. Since 2012, I have received training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, narcotics, search warrant applications, street gangs, cellular analysis, and various other crimes. In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. In the course of conducting these investigations, your affiant has been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses, conducting physical surveillance, consensual monitoring and recording of both telephonic and non-telephonic communications, and preparing and executing search warrants which have led to substantial seizures of narcotics, firearms and other contraband.

3. The facts in this affidavit come from my personal observations, training, experience, and information obtained from Agents, Detectives, Officers and witnesses. The information in this affidavit is provided for the limited purpose of establishing probable cause in connection with this application for a Warrant to Search Property. The information is not a complete statement of all the facts relating to this investigation.

**BACKGROUND ON DRUG TRAFFICKERS AND CELLULAR TELEPHONES**

4. Based on my training, experiences and participation in narcotics and drug-related investigations, and the training and experience of other Agents with whom I am working closely in this investigation, I know that:

    a) Individuals who deal in illegal controlled substances maintain books, records, receipts, notes, ledgers, bank records, money orders and other papers relating to the importation, manufacture, transportation, ordering, sale and distribution of illegal controlled substances. These records, receipts, notes, ledgers, bank records, money orders, etc. are maintained where the dealers in illegal controlled substances have ready access to them, such as in secured locations within their residence, or in their personal cellular telephones.

    b) Individuals who deal in the sale and distribution of controlled substances commonly maintain addresses and telephone number books or papers which reflect names addresses and/or telephone numbers for their associates in their illegal organization. These individuals utilize cellular telephones, computers, and electronic devices to maintain contact with their associates in their illegal businesses.

    c) Individuals who deal in illegal controlled substances often take photos of themselves, their associates, their property and illegal contraband. These photos are usually maintained in their place of residence, or the residences of friends or associates, in their business locations, or in the places of operation of the drug distribution activity,

such as a stash house or safe house. These individuals also utilize cellular telephones, computers, and electronic devices to maintain these pictures.

        d)      Persons who traffic controlled substances maintain documents, letters and records relating to illegal activity for long periods of time.  This documentary evidence is usually secreted in their residences, or the residences of friends or associates, in their business locations, or in the places of operation of the drug distribution activity, such as a stash house or safe house.  These individuals also utilize cellular telephones, computers, and electronic devices to maintain this documentary evidence.  This documentary evidence includes but is not limited to telephone numbers, telephone books, address books, credit card and hotel receipts, plane and bus tickets and receipts, car rental receipts, accounts and records in fictitious names, false identifications, money orders, cashier's checks relating to cash transactions and records indicating the existence of storage facilities used in narcotics trafficking.

        e)      Your affiant is aware that drug traffickers will utilize applications (apps) on their telephone to both send and receive money in furtherance of drug trafficking. Additionally, I am aware drug traffickers and drug users will use apps such as FaceTime and other social media apps that have messenger/call features to communicate such as Facebook, Instagram, WhatsApp, Signal, etc… Additionally, your affiant is aware that when using these features to communicate they will not be captured in toll records and/or pen registers.

**FACTS ESTABLISHING PROBABLE CAUSE**

5. During the month of June 2021, the FBI Safe Streets Task Force and Toledo Metro Drug Task Force began investigating a Drug Trafficking Organization (DTO) that was operating in the Toledo, Ohio area. The DTO is known to primarily distribute illegal narcotics, specifically fentanyl. A primary member of the investigation is ANTHONY PORTER JR., aka: "GWEEK". Your affiant has utilized two (2) confidential sources (CS) throughout this investigation, herein referenced as CS-1, and CS-2. Specifically, CS-1 has made numerous controlled buys of fentanyl form ANTHONY PORTER JR.

6. Cooperating source one (CS-1) has been cooperating with the FBI and Toledo Metro Drug Task Force since June of 2021. CS-1 is cooperating with law enforcement in the hope that his/her cooperation will be taken into consideration on his/her own narcotics case. The information CS-1 had provided have resulted in significant seizures of cocaine, fentanyl, and firearms. CS-1 has engaged in numerous controlled purchases of illegal narcotics while working with the FBI and Toledo Metro Drug Task Force. To your affiant's knowledge, the information provided by CS-1 has never proven to be false. CS-1's criminal history includes arrests and convictions for drug trafficking, drug possession, tampering with evidence, and cultivation of marijuana.

7. Cooperating source two (CS-2) has been cooperating with the FBI and Toledo Metro Drug Task Force since June of 2022. CS-2 is cooperating with law enforcement in exchange for leniency in their own narcotics case. CS-2 has engaged in numerous controlled purchases of illegal narcotics while working with the FBI and Toledo Metro Drug Task Force. To your

affiant's knowledge, the information provided by CS-2 has never proven to be false. CS-2's criminal history includes arrests and convictions for attempt to commit drug trafficking.

8. The FBI Safe Streets Task Force began making controlled purchases of drugs from the DTO, specifically fentanyl on July 29, 2021 from PORTER. During this time, your affiant was specifically aware that PORTER was utilizing multiple telephones to conduct his drug business, however CS-1 was only ever provided (419) 266-6906. On several occasions CS-1 advised your affiant that they observed PORTER with up to three (3) telephones.

9. Throughout the investigation of PORTER the confidential sources conducted a number of controlled buys in which PORTER provided the source with fentanyl. Prior to every controlled buy, the CS was provided with a recorder/transmitter, and currency for the purchase of fentanyl. The CS was also the subject of continuous surveillance during the controlled buys. Following the controlled buys, each buy was field tested and found to test positive for the presence of fentanyl. The drugs were then submitted to the Toledo Police Laboratory in which each buy did test positive for a mixture containing either fentanyl or a fentanyl analogue.

10. As a result of the initial investigation, your affiant authored a search warrants issued in the Northern District of Ohio on May 31, 2022. On June 1, 2022, your affiant as well as the FBI Safe Streets Task force Toledo RA, and the Toledo Metro Drug Task Force executed a search warrant at 4600 Blue Rock Ct., Toledo, Ohio, the known residence of PORTER, and a 2019 navy blue Dodge Ram truck owned by PORTER. Notable seizures attributable to the drug investigation are:

    a. Two (2) clear bags of suspected fentanyl. Using a Fentanyl Reagent kit which indicated positive for the presence of fentanyl.

    b. One loaded Glock, .40 cal handgun, model 21, S/N: BAZT704

    c. Ammunition

    d. A digital scale located with latex style gloves, a measuring cup with residue, and a strainer.

    e. Two silver bags marked "KEBO". One gray and one white, which field-tested positive for the presence of fentanyl.

    f. Blender with a jar of Bene Fiber.

    g. A total of $20,088.00 cash

    h. A drug press

    i. Five (5) cellular telephones.

11. On July 1, 2022, the United Stated District Court in the Northern District of Ohio authorized a search of the telephones in paragraph 10, letter i. As a result of the search, overwhelming amounts of drug evidence was located on those telephones. Your affiant observed numerous amounts of text messages outlining drug transactions from dozens of customers. Your affiant also observed multiple photographs of digital scales with large amounts of drugs on them in which your affiant believes is fentanyl.

12. Following the search warrant at the PORTER residence, your affiant, the FBI, and Toledo Metro Drug Task Force, continued the investigation of PORTER. It was found that PORTER disconnected the drug phone number he was utilizing prior to the search and began utilizing a new number. It was also found that for a period, PORTER had other persons known to your affiant selling drugs on his behalf. Those persons are Paul King, Adrian Griffin, and Arthur Phillips. At some point, PORTER began to operate the telephone himself.

13. Again, your affiant utilized a CS to conduct controlled buys of fentanyl from PORTER. Controlled buys of fentanyl were conducted through the month of March 2023.

14. As a result of the investigation in its entirety which included controlled buys as indicated above, as well as information gained in federal proffer agreements, and grand jury testimony, an indictment, and an arrest warrant was authorized for PORTER on April 5, 2023.

15. On April 6, 2023, your affiant, the FBI, Toledo Metro Drug Task Force, and the Toledo Police SWAT team executed the arrest warrant at the known location of PORTER, 4600 Blue Rock Ct.  Upon approaching the location, the Toledo Police SWAT team knocked at the door for an extended period of time as warrant notification and verbal commands were announced via loudspeaker.  After a reasonable amount of time with no answer at the door, Toledo Police SWAT breached the door where PORTER was located and taken into custody.  Two other individuals were located inside the location, Chana Smith, and Andre Foster.

16. At the time of PORTER'S arrest, a digital scale and other drug, evidence was observed in plain view.  In a bathroom attached to the bedroom where PORTER was located, your affiant and other members of law enforcement observed white powder believed to fentanyl on the toilet seat of the toilet, caked onto the inside of the toilet bowl, and floating in the water.

17. As a result of the items that were observed in plain view your affiant authored a search warrant that was authorized in the Lucas County Common Pleas Court, Lucas County, Ohio. Although not every item is listed below, the notable seizures from the search are:

        a. Plastic bag and glass jar with residue

        b. White fentanyl paste/powder from toilet

        c. Digital scales

    d.  Marijuana

    e.  Two boxes for telephones with telephone numbers written on them.  Your affiant is aware that one of the telephone numbers were the telephone number that one of the CS's was using to contact PORTER.

    f.  Backpack containing a blender, benefiber, a digital scale, and respirators.

    g.  Approximately $16,567.00 cash

    h.  Eight (8) cellular telephones which include the four (4) captioned telephones

    i.  White Jeep Grand Cherokee (OH- P937277)

18. **Subject telephone -1,** and **Subject telephone – 2,** were found inside a jacket inside the location, and both telephones were found turned on and active.  **Subject telephone – 2** was receiving calls, messages, and FaceTime calls that your affiant is aware are indicative of drug trafficking, such as a message from a contact "Ashley" who advised PORTER "Aye I was tryna gt 5 of em from I b4 wrk".  Your affiant is aware that Ashley is arranging to meet with PORTER for five (5) grams of drugs.

19. **Subject telephone – 3** was located inside the bed of PORTER, plugged into power and turned on.

20. **Subject telephone – 4** was found inside the pants pocket of PORTER after he asked for law enforcement to provide them to him.  When PORTER was arrested, he was nude.  **Subject telephone – 4** was found turned on and receiving multiple messages and calls.  Again, your affiant is aware that the messages that were being received were indicative of drug trafficking.  Messages on the screen included a message from an unknown contact "419-461-7377" advising, "What's the number? Bc we have to order something up and we are on a time limit.",  and a

message from a contact listed as "Hard" advising PORTER, "Call me I want to hook up with you." Your affiant is aware that these messages are drug users trying to get in contact with PORTER to obtain drugs.

21. Your affiant is aware that although the drug sales during this investigation were primarily made to telephone number 419-266-6906, and 419-250-1623, drug traffickers and their co-conspirators maintain other telephones which they will speak to each other about illegal activity, and/or call or message their drug supplier, as the "drug phone" is primarily used to make drug sales to drug users

22. According to a check of the Lucas County Clerk of Court on-line records search, Anthony PORTER Jr., has the following convictions in Lucas County, Ohio:

- Possession of Cocaine (F5) and Attempt to Commit Illegal Conveyance of Drugs (F4) in Case No.CR-2013-02220;
- Carrying Concealed Weapon (F4) in Case No. CR-2013-02271; and
- Attempted Trafficking in Cocaine (F2) in Case No. CR-2016-02247.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

23. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

24. There is probable cause to believe that data, information, message contents and images that were once stored on the devices may still be stored there, for the following reasons:

a) Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been

downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

      b)  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

      c)  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is
typically required for that task. However, it is technically possible to delete this information.

      d)  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

25. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices because:

a) Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b) Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c) A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d) The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e) Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

26. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

16. Based on the above facts and circumstances, affiant believes that there is probable cause to search the cellular telephone listed above for evidence, as further described in Attachment A, pertaining to violation of Title 21, U.S.C., Sections 841(a)(1), (b)(1)(A) and (b)(1)(B), Possession with Intent to Distribute Fentanyl, Title 18, U.S.C., Section 922(g), Felon in

Possession of a Firearm, and Title 21, U.S.C., Sections 846, Conspiracy to Possess with the Intent to Distribute a Controlled Substance.

Respectfully submitted,

DET. *[signature]*
TFO James Sutphin (FBI)

Sworn to via telephone on this 11th day of April 2023 after submission by reliable electronic means. Fed.R.Crim.P.4.1 and 41(d)(3).

*[signature]*
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE